**Ex Parte Brian Edward FRANKLIN,
Applicant.**

**No. 74041.**

Court of Criminal Appeals of Texas,
En Banc.

April 10, 2002.

672

Neal Davis, Dick Deguerin, Houston, for Appellant.

Charles M. Mallin, Asst. DA, Fort Worth, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, KEASLER, HERVEY, HOLCOMB, and COCHRAN, J.J. joined.

This is a post-conviction application for a writ of habeas corpus forwarded to this Court pursuant to Article 11.07, V.A.C.C.P. In 1995 applicant was convicted by a jury of aggravated sexual assault of a child under fourteen years of age. TEX. PENAL CODE § 22.021(a)(1)(B)(i), (a)(1)(B)(iii), and (a)(2)(B). His punishment was assessed at life imprisonment. The Second Court of Appeals affirmed. *Franklin v. State*, No. 2–95–084–CR (Tex.App.-Fort Worth Oct. 18, 1996, pet. ref'd) (not designated for publication).

In 1999 applicant filed a post-conviction application for a writ of habeas corpus claiming that newly discovered evidence shows him to be actually innocent of the crime for which he was convicted. The trial court conducted a hearing in which it heard testimony regarding the new evidence presented by applicant. When the transcript of applicant's initial hearing arrived, we determined that while the trial court's findings were based upon the correct level of confidence, *clear and convincing*, the standard to which this level ap-

plied was not correctly evaluated. The habeas judge's conclusion was stated as follows:

> [Applicant] has shown, through clear and convincing evidence, that [the newly discovered evidence], superimposed over the weak inculpatory evidence at his trial, *create a doubt as to the efficacy in the jury's verdict at his trial and would probably change the verdict on retrial.*

District Court's Findings of Fact, Conclusions of Law, and Order of the Court, Conclusions of Law 15 (emphasis added). Instead, we stated, that the proper test is whether applicant has shown "by clear and convincing evidence that *no reasonable juror would have convicted him in light of the new evidence.*" *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App.1996) (emphasis added). Accordingly, in an unpublished per curiam opinion on September 12, 2001, we held this writ application in abeyance and ordered the trial court to reconsider applicant's claim in light of the proper test. We also ordered a supplemental transcript containing any affidavits, the transcription of the court reporter's notes from any interrogatories or hearings held, along with the trial court's revised findings of fact and conclusions of law. The transcript directed in the order is before us, together with the trial court's findings of fact and conclusions of law, and we can now proceed to decide the issue with finality.

### I.

On April 13, 1994, B.R., the complainant, made a report to a teacher at school that she had been raped by applicant. The teacher called Child Protective Services. Applicant was subsequently charged and indicted for aggravated sexual assault of a child.

The trial commenced in February of 1995. At trial B.R. testified that one eve-

ning in March of 1994,[1] applicant raped her in the backyard of her father's house.[2] At the time, B.R. was thirteen years old. Applicant was a friend of the family and often visited B.R.'s father. B.R. testified that her father and his girlfriend were inside the house during the rape. She did not tell her father and his girlfriend about the experience after she returned to the house. Applicant testified that prior to the time of the sexual assault, she had never had sexual relations with anyone.

B.R.'s mother, G.G., was also called as a state's witness. She testified that the following day after B.R. returned from visiting her father during spring break in March, she found a pair of blood-stained underwear in the laundry that B.R. brought home. She stated that B.R. had her period two weeks prior to the day that she found the stained underwear. She noticed that the stain was a brighter red than that of the color of menstrual blood. The underwear, however, was not produced at trial because G.G. had bleached them and could no longer differentiate that pair from other pairs of B.R.'s underwear.

Dr. Jan Lamb, the doctor who examined B.R. on April 20, 1994, following her outcry, testified that B.R. told her that she had been raped by applicant in March of 1994. In addition, she stated that the examination indicated that there was a rupture in a certain area of the hymen indicative of blunt force trauma and that the injury observed on B.R. would be consistent with her bleeding at the time of the offense. Such blood, she stated, would have been bright red in color from rupturing capillaries as opposed to the darker color of menstrual blood. On cross-exami-nation Lamb admitted that blunt force trauma is not in itself an indication that someone has been raped and that you could find the same thing after a person has engaged in sexual intercourse for the first time. Since the exam was removed from the exact time of the assault, no forensic evidence was collected.

Constance Patton, a forensic serologist with the Tarrant County Medical Examiner's Office was called as a defense witness. She testified that blood on clothing gets darker in color the older the stain is and that if a stain is bright red, it is an indicator that the blood has not been present for a very long period of time. She explained that within six to eight hours, a blood stain on clothing is going to start to turn dark red to a brownish color.

Applicant did not testify at the trial. The jury found applicant guilty of aggravated sexual assault of a child and assessed punishment at life imprisonment.

In May of 1998 the Tarrant County District Attorney's Office notified applicant's trial counsel that it had received an affidavit from the police in which B.R. stated that she had been sexually assaulted by her step-father from the time when she was six years old until the time that her mother moved her away from her step-father.[3] After receiving this information, applicant filed the present application for a post-conviction writ of habeas corpus based on newly discovered evidence.

The district court conducted a habeas hearing in which several witnesses were called to testify. Applicant first called Rose Salinas, the lead prosecutor in appli-

---

1. The exact date of the alleged offense was never determined at trial.

2. B.R.'s parents were divorced. Although she lived with her mother, her father was given court-ordered visitation rights.

3. The period of abuse, which started before applicant assaulted B.R. and continued afterwards, lasted for approximately ten years.

cant's trial, to testify.[4] She stated that at the time she prosecuted applicant, she felt that B.R. was a credible witness. But if she had found out B.R. had lied to her during the trial, she testified that her opinion as to B.R.'s credibility would have changed. Moreover, she never would have been able to offer the medical evidence that was introduced at trial against applicant. On cross-examination she testified that the fact that there was another perpetrator would have not prevented her from trying the case and that she would have still prosecuted the case without the medical testimony. When asked by the trial court judge whether she would have moved to dismiss the case once she found out B.R. had lied to her she stated, "[H]ad we been in trial and this child had committed perjury and I found out about it after the fact, what I am saying is I might have moved to dismiss the case. And I'm very serious about the fact that that's a very strong possibility that it would have happened."

Applicant also called Dr. Jan Lamb as its witness. She testified that if she had known that B.R. was also sexually assaulted by her step-father, she would not have been able to testify at trial as to which incident caused B.R. to have had blunt force trauma to her hymen. On cross-examination when asked if the knowledge that B.R. did not disclose the abuse by her step-father changed her opinion of B.R.'s credibility she stated "no." She explained that it is not unusual for children who are victims of sexual abuse not to discuss their sexual abuse. In addition, she also explained that children who have been sexually victimized are much more easily revictimized due to the fact that they have very poor emotional, psychological and physical boundaries.

Applicant was also called as a witness. He produced various receipts and a phone bill in order to provide an alibi for the time period during which it was believed that the offense occurred. Although available at the time, none of these documents were introduced at applicant's trial.

B.R. was called by the State to testify. She stated that aside from the statement that she had never engaged in sexual intercourse before, everything else to which she testified during applicant's trial was true. She testified that the reason that she did not tell anyone about the sexual abuse she suffered by her step-father, J.G., was that she was afraid of him. She explained that she was unable to tell Ms. Salinas, Dr. Lamb, or counselors that she was being abused by J.G. due to the fact that he would almost always accompany her to the meetings. He was even in the room the day on which Dr. Lamb conducted the sexual assault examination. Moreover, she testified that during the couple of times that J.G. did not accompany her to the appointments, he would insist that she tell him what had happened during the meetings. He was angry when he found out that B.R. had reported the sexual assault by applicant because he was afraid that people would find out about his own actions. On cross-examination, B.R. stated that contact with J.G. had also caused her to bleed on a few occasions, but not as much as she bled following the assault by applicant.

■ Initially the habeas judge concluded that applicant "has shown, through clear and convincing evidence, that [the newly discovered evidence] superimposed over the weak inculpatory evidence at his trial, create a doubt as to the efficacy in the jury's verdict at his trial and would

---

4. At the time of the habeas hearing, Salinas was no longer with the Tarrant County District Attorney's office but was working as an attorney in private practice.

probably change the verdict on retrial." District Court's Findings of Fact, Conclusions of Law, and Order of the Court, Conclusions of Law 15. We ordered the trial court to reconsider applicant's claim in light of the test expounded in *Elizondo.* In its supplemental order the trial court concluded that "Applicant Franklin has shown by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." District Court's Supplemental and Revised Conclusions of Law and Order of the Court, Conclusions of Law 6.[5]

### II.

■ In *State ex. rel. Holmes v. Third Court of Appeals,* 885 S.W.2d 389, 397 (Tex.Crim.App.1994), we accepted the proposition that the execution of an innocent person would constitute a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Accordingly, we held that a post-conviction application for a writ of habeas corpus was an appropriate vehicle for a convicted defendant sentenced to death to assert a claim of actual innocence. *Id.* at 398. Approximately two years later in *Elizondo* we were presented with the issue of whether a claim of actual innocence was cognizable by this Court in a post-conviction habeas corpus proceeding when the punishment assessed is not death but confinement. *Elizondo,* 947 S.W.2d at 204. We concluded that the basis for entertaining a post-conviction application for a writ of habeas corpus claim of actual innocence is not peculiar to capital cases in that the

incarceration of an innocent person is as much a violation of the Due Process Clause as is the execution of an innocent person; thereby making claims of actual innocence cognizable by this Court in post-conviction habeas corpus proceedings whether the punishment assessed is death or confinement. *Id.* at 205.

■ Claims of actual innocence are categorized either as *Herrera*-type claims or *Schlup*-type claims. *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Elizondo,* 947 S.W.2d at 208. A *Herrera*-type claim involves a substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence. *Schlup,* 513 U.S. at 314, 115 S.Ct. 851; *See also Elizondo,* 947 S.W.2d at 208. A *Schlup*-type claim, on the other hand, is a procedural claim in which applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial. *Schlup,* 513 U.S. at 314, 115 S.Ct. 851.[6] The two claims require applicants to meet different burdens in order to obtain habeas relief.

In *Schlup,* the petitioner asserted a claim of actual innocence by claiming that constitutional error deprived the jury of critical evidence that would have established his innocence. *Id.* at 301, 115 S.Ct. 851. Before addressing the merits of Schlup's claim, the Supreme Court discussed the importance of distinguishing

---

5. Although this Court is not bound by the findings of the trial court in post-conviction habeas corpus proceedings, such findings are considered if supported by the record. *Ex parte Morrow,* 952 S.W.2d 530, 534 (Tex. Crim.App.1997). We find in the present case that although the trial court properly applied the narrow holding of *Elizondo,* it failed to take into account its greater purpose.

6. *See generally* Henry Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U. CHI. L.REV. 142 (1970) (arguing that "convictions should be subject to collateral attack only when the prisoner supplements his constitutional plea with a cognizable claim of innocence").

between the type of claim asserted by Schlup versus the type of claim asserted by the petitioner in *Herrera*. In *Herrera*, the petitioner based his claim of actual innocence on newly discovered evidence that showed that his brother committed the crime for which he was convicted. *Herrera*, 506 U.S. at 396, 113 S.Ct. 853. The Court expounded upon the difference between the two situations:

Schlup's claim thus differs in at least two important ways from that presented in *Herrera*. First, Schlup's claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his *Strickland* and *Brady* claims. Schlup's claim of innocence is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."

More importantly, a court's assumptions about the validity of the proceedings that resulted in a conviction are fundamentally different in Schlup's case than in Herrera's. In *Herrera*, petitioner's claim was evaluated on the assumption that the trial that resulted in his conviction had been error free. In such a case, when a petitioner has been "tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants," it is appropriate to apply an " 'extraordinarily high' " standard of review.

\* \* \*

Consequently, Schlup's evidence of innocence need carry less of a burden. In Herrera (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally in-

tolerable" *even if* his conviction was the product of a fair trial. For Schlup, the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was a product of a fair trial.

*Schlup*, 513 U.S. at 315–16, 115 S.Ct. 851 (citations omitted). The Court concluded that in a *Schlup*-type situation, the petitioner must show that the constitutional error "probably resulted" in the conviction of one who was actually innocent. *Id.* at 326–27, 115 S.Ct. 851. The Court articulated the meaning of probably resulted as follows: "The petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 115 S.Ct. 851; *see also Elizondo*, 947 S. W.2d at 209. For a *Herrera*-type claim, however, the bare claim of innocence would fail unless the court was convinced that the new facts "unquestionably establish" applicant's innocence. *Schlup*, 513 U.S. at 317, 115 S.Ct. 851. The Court failed to elaborate, however, as to the level of confidence invoked by the use of the phrase "unquestionably establish."

In *Elizondo* applicant presented this Court with a *Herrera*-type claim. Applicant raised a claim of actual innocence based upon the recantation of testimony given by one of the victims of a crime for which applicant was convicted. We determined that the standard set by this Court in *Holmes*, which was decided prior to *Schlup*, made it "theoretically impossible" for any habeas applicant to gain relief. *Elizondo*, 947 S.W.2d at 205. In *Holmes* we held that "in order to be entitled to relief on a claim of factual innocence the applicant must show that based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt." 885

S.W.2d at 398. As such, we turned to *Schlup* for guidance and modified the standard to be applied in *Herrera*-type claims. We determined the "unquestionably establish" language as meaning the same thing as "clear and convincing." *Elizondo*, 947 S.W.2d at 209.

### III.

In the present case, applicant does not raise any procedural claims attacking the constitutionality of his trial proceedings. Instead, he asserts a *Herrera*-type claim in which he argues that newly discovered evidence, B.R.'s admission that she was sexually assaulted by her step-father, entitles him to habeas relief. Applicant cites to the test set forth in *Elizondo*.

In *Elizondo* we held that an applicant asserting a *Herrera*-type claim must show *by clear and convincing evidence* that no reasonable juror would have convicted him in light of the newly discovered evidence. *Id.* Today we take this opportunity to explain the type of evidence that is required by this Court in order to succeed on a *Herrera*-type claim. Although not explicitly stated in the holding, it is clear that *Elizondo* requires that applicants presenting *Herrera*-type claims offer evidence that goes towards affirmatively proving applicant's innocence. In *Elizondo* we explained:

> Because, in evaluating a habeas claim that newly discovered evidence or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such *exculpatory* evidence against the evidence of guilt adduced at trial.

*Id.* at 206 (emphasis added). In addition, when discussing a suitable standard for describing applicant's burden of proof in a collateral proceeding where he does not attack the rationality of a factfinder's verdict, we cited to the formulation described by Justice Blackmun in his dissent in *Herrera* where he explained that applicants must produce evidence that proves their innocence and not merely raises doubt about their guilt:

> The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is actually innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence not just raising doubt about his guilt.

506 U.S. at 443, 113 S.Ct. 853 (Blackmun, J., dissenting) (citations omitted). Finally, when discussing the grounds on which we afforded applicant relief in *Elizondo*, we explained, "Robert's recantation not only voids his trial testimony which implicated applicant, but constitutes *affirmative evidence* of applicant's innocence. We are convinced by clear and convincing evidence that no rational jury would convict him in light of the new evidence." *Elizondo*, 947 S.W.2d at 210 (emphasis added). It is apparent that our holding in *Elizondo* was meant to act as a mechanism for freeing the innocent, not as a vehicle for out-of-time motions for new trial.

A conviction that results from a constitutionally error-free trial is entitled

to the greatest respect. *Id.* at 209. Accordingly, we hold that when an applicant asserts a *Herrera*-type claim based on newly discovered evidence, the evidence presented must constitute affirmative evidence of the applicant's innocence.[7] Once the applicant provides such evidence, it is then appropriate to proceed with a determination of whether the applicant can prove by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence.

■ Applicant fails to present any new evidence aside from the fact that B.R. now alleges that she was also sexually assaulted by her step-father. B.R. does not recant her trial testimony. Rather she continues to allege that applicant sexually assaulted her. In her affidavit she makes this assertion on two separate occasions. She first states, "When I was 13 years old I was sexually abused by another person and when [J.G.] found out about it he was mad at me and said I must have wanted it because I didn't tell him about it. Every few months [J.G.] would get mad at me about it again." In addition she states, "I have not had sexual intercourse with anyone else but [J.G.] and the time before when I was sexually assaulted and I was 13 years old." Finally, at the habeas hearing she testified that she had been sexually assaulted by applicant.

Although applicant's evidence is important, it is limited to the impeachment of B.R.'s claim that she did not have sexual relations with other men. It certainly calls into question her veracity in general, but only collaterally affects her accusation against applicant. This evidence standing alone, however, it is not dispositive of applicant's claim of innocence.

Applicant's writ is based upon the theory espoused in *Herrera* and as such he must establish his innocence of the crime by clear and convincing evidence and not merely that he would be found not guilty by a subsequent jury. While there is no question that in an appropriate case the principles of comity and finality "must yield to the imperative of correcting a fundamentally unjust incarceration," *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1981), we find that applicant has not presented this Court with such a case. Applicant's claim is denied.

WOMACK, J., filed a concurring opinion.

JOHNSON, J., dissented.

WOMACK, J., filed a concurring opinion.

Today the Court again purports to rely on *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), as authority for the legitimacy of presenting a claim of newly-discovered evidence through habeas corpus. *Herrera* so clearly stands for the opposite proposition that one hardly knows whether to laugh or cry at this Court's perversion of it.

The holdings of that case were: (1) Federal habeas corpus is not available for a claim of newly discovered evidence of innocence in the absence of a violation of constitutionally-required procedures. To require a new trial simply because a jury might acquit in light of the new evidence would not clearly produce a more reliable result, since the passage of time only diminishes the reliability of criminal adjudications. (2) Texas's 30 day limit to move for new trial on newly discovered evidence does

---

**7.** In addition to trustworthy witness recantations, other examples of such evidence may include exculpatory scientific evidence, trustworthy eyewitness accounts, and critical physical evidence. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851.

not deny due process. (3) Executive clemency is the traditional "fail safe" remedy for late evidence of innocence. (4) Even if it were assumed for the sake of argument that a truly persuasive demonstration of actual innocence would render an execution unconstitutional so that federal habeas corpus would lie, Herrera's evidence fell far short of the extraordinarily high threshold showing that would be required. (Herrera's evidence was two witnesses who said that Herrera's brother, now dead, had admitted committing the crime.)

This is mighty thin sand on which to erect the holding ... that due process (not the Cruel and Unusual Punishment Clause) would be violated by the execution of an innocent defendant, and that state habeas corpus will lie to permit a defendant to present newly discovered evidence of innocence. And it is no support at all for the holdings in this case that due process is violated by the confinement of an innocent defendant, that post-conviction habeas corpus is available to correct errors of fact, that the defendant must prove his claim by no more than clear and convincing evidence, and that the evidence of a recanting witness might be sufficient.

[Because of these holdings] a convicted defendant in every criminal case (if it is a due process problem, there is no reason to limit it to felonies or to sentences of confinement), will now be allowed and encouraged to pursue the witnesses and get them to recant. If he does so, he can relitigate his case forever. And all this is supposed to be based on *Herrera*, where the Court said that habeas corpus was not available because, " 'Due process does not require that

every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.' *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). To conclude otherwise would all but paralyze our system for enforcement of the criminal law." *

As the Court takes another small step down the path of paralysis, I can only respectfully concur.

---

* *Ex parte Elizondo*, 947 S.W.2d 202, 215 (Tex. Cr.App.1997) (Womack, J., dissenting to denial of rehearing).