IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,244






EX PARTE BENJAMINE JOHN SPENCER, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. W87-96524-T(A) FROM THE

283RD JUDICIAL DISTRICT COURT OF DALLAS COUNTY





 Meyers, J., delivered the opinion of the Court in which Keller, P.J., and
Price, Womack, Johnson, Hervey, and Cochran, JJ., joined. Price, J., filed a
concurring opinion in which Hervey and Cochran, JJ., joined. Keasler, J.,
concurred.


O P I N I O N



 Applicant, Benjamine (1) John Spencer, was convicted of murder and sentenced to 35
years' confinement. He filed a motion for new trial, which was granted. On retrial, he
was convicted of aggravated robbery and sentenced to life in prison. The conviction was
affirmed on appeal. Spencer v. State, No. 05-88-00397-CR (Tex. App.-Dallas May 3,
1989) (not designated for publication). Applicant filed an application for writ of habeas
corpus claiming that he is actually innocent, that trial counsel rendered ineffective
assistance, and that the State violated Brady v. Maryland, 373 U.S. 83 (1963), and
Mooney v. Holohan, 294 U.S. 103 (1935). 

 The trial court held an evidentiary hearing and recommended that we grant relief. 
We remanded the case to the trial court for additional findings and conclusions. After
receiving the trial court's findings and conclusions, we filed and set this case for
submission and ordered the parties to brief whether Applicant properly raised a free-standing actual innocence claim, whether the evidence he relies on is newly discovered or
newly available, whether we should consider advances in science and technology when
determining whether evidence is newly discovered or newly available, and whether
Applicant has shown by clear and convincing evidence that no reasonable juror would
have convicted him in light of the new evidence. Relief is denied.

BACKGROUND At around 10:45 p.m. on March 22, 1987, police received a call that a man was
lying face down in the street. When they arrived, they found the victim, Jeffrey Young,
unconscious and bleeding. He was taken to the hospital, where he died. It was later
determined that he died from severe skull fractures that were a result of multiple blows to
the head. Less than two hours after the victim was found in the street, police received a
call about a BMW parked in a nearby alley. They quickly ascertained that the car
belonged to the victim.

 Two days later, a witness, Gladys Oliver, went to the police station to tell what she
had seen in the alley that night and also to give the police the names of others who may
have seen something. She had heard that the police were accusing another man named
Spencer, Van Mitchell Spencer, of stealing the BMW, and she wanted to inform them that
it was Applicant, Benjamine John Spencer, whom she had seen getting out of the car. 
Based on the information from Oliver and the other witnesses, Applicant and his co-defendant, Nathan Robert Mitchell, were arrested the next day.

 Several eyewitnesses who lived in the area where the victim and his car were
found testified at Applicant's trial. Charles Stewart testified that he saw the victim get
pushed out of the car, saw the car pull into the alley, and saw Applicant get out of the
passenger's side of the car and Mitchell get out of the driver's side. He saw Applicant
jump Gladys Oliver's fence and go through her back yard. He testified about the lighting
conditions in the alley, including that there was a streetlight in the alley and a light in the
back of one of the houses that backed up to the alley. He also stated that the lights inside
the car came on when the doors opened, and he recognized Applicant and Mitchell.

 Donald Merritt testified that he saw a white man lying in the street struggling to
breathe and with blood on his head. Merritt stayed at the scene until paramedics arrived. 
He later saw the BMW in the alley and saw Applicant's co-defendant standing by the car. 
He said he could see clearly because there was a streetlight nearby.

 The alley where the BMW was found was behind Gladys Oliver's house. She
testified that she saw the BMW stopped behind her neighbor's house and saw Applicant
get out of the passenger's side of the car and Mitchell get out of the driver's side. She
said she saw Applicant go through one neighbor's yard and knock on another neighbor's
door. Oliver stated that there was a streetlight in the alley and a large light in the back of
her neighbor's house that lit her yard. She claimed that when she went to the front of her
house, she saw Applicant's car parked in the street, but it was gone about 15 minutes
later. She did not tell the police this the day after the offense when they went door-to-door asking questions, but two days later she went to the police station to tell them what
she had seen and claimed that she was afraid for her life. 

 Jimmie Cotton testified that he was in his kitchen cooking dinner when he saw the
BMW pull into the alley. He noticed the BMW because it was not the sort of car he
usually saw in the neighborhood. He said that when the car doors opened, a light came
on, and he saw Applicant get out of the passenger side. Cotton saw Applicant climb the
fence around Gladys Oliver's yard and later saw him get into his own car and drive away. 
Cotton testified that he could see everything in the alley because there was a streetlight
just behind his house and his neighbor had a porch light on. 

 Danny Edwards was one of Applicant's cellmates. Edwards informed police that
Applicant told him about the crime. He testified that Applicant said he hit the victim in
the head with a gun, put him in the back seat of the car, hit him a couple more times while
they were driving, and then kicked him from the car. Edwards said that Applicant
planned to take the car to a chop shop.

 Applicant offered testimony at trial that, on the night of the offense, he drove
Ramona Williams and her friend to church. He said he spent the rest of the evening with
Ramona's sister, Christie, first at her house and then at the park, and that Ramona saw
Applicant's car at the park at around 11 p.m. when she was returning home from church.

 A jury found Applicant guilty of murder in 1987, and after his motion for a new
trial was granted, a separate jury found him guilty of aggravated robbery in 1988. His co-defendant, Mitchell, was also found guilty based on much of the same eyewitness
testimony that was raised in both of Applicant's trials.

APPLICANT'S WRIT OF HABEAS CORPUS

 Applicant raises the following issues in his application for writ of habeas corpus:

 (1) The State failed to disclose evidence in violation of Brady v. Maryland,
373 U.S. 83 (1963);

 (2) The State knowingly relied on perjured testimony in violation of Mooney v. Holohan, 294 U.S. 103 (1935);

 (3) Trial counsel rendered ineffective assistance; and

 (4) Applicant is actually innocent.

 Applicant states that his trial was "constitutionally deficient." He claims that
Edwards' testimony was perjured and that he testified falsely in exchange for a reduced
sentence. He also claims that Edwards recanted his testimony in 2002. Applicant asserts
that it was Michael Hubbard who probably committed the murder. Hubbard told friends
that he had committed the crime and that two men had already been arrested for it. 
Applicant claims that Hubbard had knowledge of items that were stolen from the victim
that had not been publicly disclosed. Applicant says that the police had information
related to Hubbard's involvement in the crime, but they failed to investigate. 

 At the writ hearing, Applicant presented testimony that Hubbard's friend, Kelvin
Johnson, was the cellmate of Applicant's co-defendant, Mitchell. After Mitchell
attempted suicide in jail, Johnson told him that he knew who had committed the offense
for which Mitchell had been arrested. Police contacted Johnson, and he informed the
detective that Hubbard had told him about "this white dude that had been killed in west
Dallas." Johnson told the officer that Hubbard admitted to stealing the man's car and
putting him in the trunk. Hubbard told Johnson that the man fell out of the trunk and hit
his head and that is how he died. The officer drafted an affidavit of Johnson's statement,
but Johnson refused to sign it. At the writ hearing, Johnson said that he had been mad at
Hubbard at the time the police took the affidavit because Hubbard had turned him in for a
series of aggravated robberies that they had committed together, but he said the reasons
why he refused to sign the affidavit were his concern for Hubbard's mother and that he
did not want Hubbard to get the death penalty.

 Ferrell Scott also testified at the writ hearing. Scott claimed that Hubbard told him
that he had robbed a man outside of an office building, took his BMW, put him in the
trunk, and drove him to west Dallas. Hubbard told Scott that while he was driving, he
noticed that the trunk of the car was open, so he abandoned the car in an alley. Scott
helped Hubbard sell a Seiko watch that he claimed was stolen from the victim. After
Scott met Applicant in prison, he claimed that he told his attorney and the police that
Hubbard had committed the offense for which Applicant had been charged. Applicant
complains that his trial counsel was ineffective for failing to argue at trial that Hubbard
had committed the crime. 

 The defense also called Dr. Michel, a forensic visual science expert, to testify at
the writ hearing. Dr. Michel's expert testimony was that the eyewitnesses could not have
seen the face of the person exiting the BMW because of darkness, distance, and
movement. Specifically, Dr. Michel testified that Cotton would not have been able to
make a facial identification of a person jumping a fence 113 feet away from him. He also
stated that Stewart was so far from the BMW that he would not be able to make a facial
identification even in daylight, and Oliver could not have made a facial identification of a
person exiting the passenger side of the BMW because her window was 123 feet away
from the car. Applicant says that the State's expert agreed that with the distance and
lighting conditions, Oliver would not have been able to identify facial features of the
individuals exiting the car. Applicant's argument is that it was physically impossible for
the eyewitnesses to make a facial identification.

 Oliver and Cotton testified at the writ hearing and reiterated their testimony from
Applicant's trials. Eyewitness Stewart died before the writ hearing.

FINDINGS AND CONCLUSIONS OF THE TRIAL COURT

 After the habeas hearing, the trial court entered 300 findings of fact and
conclusions of law, summarized as follows:

 Finding no merit to Applicant's Brady, ineffective assistance, and knowing use of
false testimony claims, the trial court recommended that relief be denied on these
grounds.

 The trial court found that the only evidence inculpating Applicant at trial consisted
of the testimony by Danny Edwards that Applicant confessed to the crime while he was in
jail and the testimony of the eyewitnesses who saw Applicant exit the victim's BMW;
there was no physical evidence presented by the State connecting Applicant to the crime. 
The trial court concluded "that none of Danny Edwards' testimony was credible and,
when viewed in the light most favorable to the State, was inadmissible hearsay."

 The court determined that Danny Edwards's testimony that he did not speak
directly with Applicant was newly discovered evidence, as was the testimony of Kelvin
Johnson regarding Hubbard's confession to the abduction and robbery of Jeffrey Young. 
The court found that Hubbard's confession was more consistent with the facts of the
offense than the testimony given by Danny Edwards, and it stated that "between the
unsigned Affidavit in Fact provided by Kelvin Johnson and the signed statement by
Danny Edwards, on their face, the Johnson statement is more consistent with the actual
facts of the murder and therefore more credible." 

 Applicant's habeas evidence also includes expert testimony that the now
developed field of forensic visual science conclusively establishes that it was physically
impossible for the purported eyewitnesses to make the identification that they claimed.

 Regarding the expert testimony, the court found that at the time of the trial in 1987,
"the evidence generated by the application of forensic visual science was unavailable and
undiscoverable." Based on the testimony of the expert, the court found "that Cotton did
not actually see the face of the person exiting the BMW," that "Cotton was not able to
make an identification of the person he claimed to have seen at that point," and that
Cotton was not a credible witness and was not worthy of belief. The court also found
"that Stewart was so far from the BMW that even in daylight it would take super human
[sic] abilities to make a facial identification" and "that it was not possible for Charles
Stewart to see well enough to make facial identifications of any persons exiting the
BMW." Similarly, the court found "that it was not possible for Gladys Oliver to see well
enough to make facial identifications of any persons exiting the BMW," and Gladys
Oliver was not a credible witness and was not worthy of belief. The court determined
"that the identification testimony given by Jimmy Cotton, Charles Stewart, and Gladys
Oliver was not truthful" and that "it was physically impossible for Jimmy Cotton, Charles
Stewart, and Gladys Oliver to make facial identification of a person exiting the BMW on
March 22, 1987."

 Finally, the court determined that, "[i]n the instant case, after considering the
newly discovered evidence consisting of the expert testimony of Dr. Paul Michel that the
three eye witnesses could not have seen what they testified to, the only remaining
evidence of Applicant's guilt is the testimony of Danny Edwards which was at best
inadmissible hearsay. Thus, there remains no evidence of Applicant's guilt." As a result,
the court concluded that "Applicant has carried his burden of production and persuasion
and the writ should issue." The court recommended that relief be granted on the grounds
of actual innocence.

STATE'S RESPONSE

 The State responds that Applicant did not properly raise a free-standing actual
innocence claim; that the evidence is not newly discovered; and that advances in
technology should be considered, but only when the advances are reliable and are able to
test the evidence as it existed at the time of the crime. 

 The State claims that Applicant has not shown by clear and convincing evidence
that no reasonable juror would have convicted him in light of newly discovered evidence.

Based on Schlup, (2) Applicant claims that constitutional errors "probably resulted in the
conviction of a man who is actually innocent." The State says that Applicant does not
directly raise an actual innocence claim. The State claims that, even if Applicant did
properly raise an actual innocence claim, he is not entitled to relief under Schlup or
Herrera. (3) It is not a Schlup claim because, according to the trial court's findings and
conclusions, there was no Brady violation, the State did not knowingly use false
testimony, and counsel was not ineffective; therefore, Applicant has not proven that there
was constitutional error at his trial. And the State argues that, even if we consider the
issues raised by Applicant to be newly discovered evidence, he is not entitled to relief
under Herrera because the evidence does not show that he is actually innocent.

 Second, the State says that Applicant does not present newly discovered evidence.

The State claims that the only affidavit from Danny Edwards that was not available and
known to Applicant at the time of the trial was his 2002 affidavit, which he later said
contained untrue statements. And the 2002 affidavit is contradicted by his trial testimony
and by his 2005 affidavit. The State argues that this evidence does not show that it is
"'probable that the verdict would be different' as required by Elizondo, 947 S.W.2d at
209." (4) 

 The State disagrees with the trial court's conclusion that the testimony of Kelvin
Johnson is newly discovered evidence. The State argues that this evidence was known to
defense counsel before Applicant's trial. Defense counsel had an affidavit in which
Johnson stated that Michael Hubbard admitted to committing the offense. However,
counsel also knew that Johnson had recanted this statement and had failed a polygraph
given to him to test the validity of his claim regarding Hubbard. The State asserts that
Johnson's knowledge of specific facts about the crime likely came from Applicant's co-defendant, who shared a cell with Johnson, and not from Hubbard, who Johnson claimed
told him about the offense. Because this is not newly discovered evidence and is not
credible, it cannot be considered as evidence supporting Applicant's claim of actual
innocence.

 The State argues that Applicant has not shown by clear and convincing evidence
that Dr. Michel's report is true and would have caused a different result at trial. The
lighting conditions and the distance of the witnesses was known at the time of trial, and
defense counsel was able to point out that witnesses would have had a difficult time
identifying the defendant in the alley. Thus, even if an expert was not available at the
time of the trial to testify about possible problems with illumination, the expert's report
and testimony should not be considered newly discovered evidence. The fact that the
witnesses were at a certain distance and under certain lighting conditions was known at
the time of trial and was presented to the jury for their consideration.

 The State agrees that advances in science and technology should be considered
when determining whether evidence is newly discovered or newly available. However,
since not all advances have the same reliability, the weight to be given the advances must
be considered on a case-by-case basis. In this case, little weight should be given because
the expert's report could not be based on the conditions at the time of the offense, forcing
the expert to make too many assumptions. The State argues that since the evidence is not
the same as it existed at the time of the offense, it cannot be treated the same way DNA is. 
All of these assumptions cannot overcome the testimony of witnesses who said they had
enough light to see Applicant get out of the victim's car.

 The State filed an objection to the trial court's findings and conclusions, claiming
that the court does not address the issue of laches and that the court recommends relief on
a ground that was not properly raised in the application or proven by the evidence. The
State claims that Kelvin Johnson's evidence was known to defense counsel before
Applicant's 1998 trial; thus it is not newly discovered. The State argues that the
eyewitnesses were credible and that three separate juries believed their testimony-juries
in each of Applicant's two trials and his co-defendant's trial. The State notes that the
judge at the habeas hearing was not at the trial and was not able to judge the credibility of
the eyewitness testimony at trial. The State asserts that Applicant's expert failed to take
into consideration that Gladys Oliver was very familiar with Applicant as she had known
him and his family for years and had even seen him earlier on the day of the offense, and
that eyewitness Stewart had also known Applicant for several years and was able to
recognize him when he saw him get out of the victim's car in the alley.

 The State argues that the only new evidence is the report by the expert. The State
says, 

 Rather than comparing the old inculpatory evidence with the new evidence,
the trial court seems to have simply declared that none of the State's
witnesses are credible because Applicant's expert says they could not have
seen what they saw. After rejecting all of the State's evidence, the court
then determined that only the new evidence is left, so Applicant must be
actually innocent. The State submits that when a true comparison of the old
and the new evidence is made, a rational trier of fact would give much more
credence to the testimony of three eyewitnesses who were at the scene of
the crime twenty years ago, and who knew and recognized Applicant, as
compared to a lighting expert who reviewed the scene sixteen years later
and based his opinions on incorrect and incomplete assumptions.

REMAND

 We remanded the case to the trial court for additional findings and conclusions. 
Specifically, we asked the trial court to determine what methods were used by the expert
and whether these methods were available at the time of Applicant's trial. We also
requested further findings regarding Danny Edwards's testimony, including whether he
made a plea agreement with the State after meeting Applicant in prison, whether Edwards
had filed any pretrial motions on Applicant's behalf, and whether there was evidence to
support Edwards's claim that Applicant had sanded his fingerprints. Finally, we asked
the trial court to enter findings regarding Applicant's claim of ineffective assistance of
counsel and the State's claim of laches.

 In response to our remand, Applicant states that Dr. Michel analyzed the
"illumination and visibility" to evaluate the validity of the eyewitness accounts and
determined that all the witnesses had three constraints: distance, low levels of
illumination, and time limitations. The expert concluded that witness Cotton had the
additional constraint of "adaptation to daylight levels of illumination while viewing a
dark environment" and reflection from the light in his kitchen. Dr. Michel considered
only distance, darkness, and motion-"the ability of us as human beings with our sensory
organs for light which are our eyes to discern things." He claimed that he did not
consider eyewitness familiarity with the Applicant because that was "the soft science of
recognition, memory, cognition and fitting in what makes sense." He said, "I have stayed
away from that because my opinion is because there was no basis to believe that the
eyeballs could have discerned seeing clearly, that the opinions given by the witnesses
were something over in the soft science area of memory, cognition, expectation, things of
this nature." And, the fact that the witnesses knew Applicant "does not change the
eyeball's ability to resolve an image and send it back to the brain." 

 Both the State and Applicant agreed that the expert's methods were not widely
known at the time of trial and that forensic visual science was not available or recognized
in the late 1980's. 

 On remand, the trial court found that Dr. Michel relied on the application of the
physiology of the eye to issues of visual identification, a forensic application of optometry
which evaluates what a person could or could not see under a given set of circumstances
and that such forensic visual science evidence was unavailable and undiscoverable at the
time of Applicant's trial. The court concluded that the State waived its right to challenge
the admissibility of forensic visual science and of Dr. Michel as an expert. Additionally,
because the expert had read the trial testimony of the eyewitnesses prior to visiting the
scene, the court determined that the fact that the identifications were not stranger-on-
stranger would not have changed the expert's opinion.

 The court found no evidence that Edwards met Applicant, so it could not
determine whether Edwards made a plea agreement after meeting Applicant in prison. 
The court also found no evidence supporting Edwards's testimony that Applicant had
sanded his fingerprints or that Edwards had filed pre-trial motions on Applicant's behalf.

 The court concluded that trial counsel was not ineffective for failing to attempt to
impeach Edwards regarding his plea agreement and used sound trial strategy for not
eliciting testimony showing that Van Mitchell Spencer had been ruled out as a suspect.

 The court concluded that the State's issue of laches is moot in this case.

CASELAW An applicant may raise either a Herrera-type or Schlup-type claim of actual
innocence. Schlup v. Delo, 513 U.S. 298 (1995); Herrera v. Collins, 506 U.S. 390
(1993). The Herrera-type is a bare innocence claim that is based solely on newly
discovered evidence. In Herrera, the Supreme Court instructed us to consider both the
new evidence and the trial evidence and determine whether the new facts unquestionably
establish the applicant's innocence. Applicants are required to meet a higher threshold to
obtain relief because, when the trial has been constitutionally error free, the conviction is
entitled to the utmost respect. 

 In a Schlup-type claim, innocence is tied to a showing of constitutional error at
trial. An applicant must show that the constitutional error probably resulted in the
conviction of one who was actually innocent. Thus, a Schlup claim here depends on the
validity of the Brady and ineffective assistance claims. 

 We were presented with a Herrera-type claim in Ex parte Elizondo, 947 S.W.2d
202 (Tex. Crim. App. 1996). We held that "our job is not to review the jury's verdict but
to decide whether the newly discovered evidence would have convinced the jury of
applicant's innocence." Id. at 207. If the new evidence unquestionably establishes
innocence, then it must be compared to the old inculpatory evidence that was offered at
trial to determine whether a rational trier of fact would acquit the applicant based on the
comparison of the new and old testimony. Id. at 206. We stated:

 Of course, any person who has once been finally convicted in a fair trial
should not be permitted to wage, and we do not permit him to wage, a
collateral attack on that conviction without making an exceedingly
persuasive case that he is actually innocent. It is thus entirely reasonable to
insist, and we continue to insist, that an applicant for habeas relief based on
a claim of actual innocence must 'demonstrate that the newly discovered
evidence, if true, creates a doubt as to the efficacy of the verdict sufficient
to undermine confidence in the verdict and that it is probable that the
verdict would be different [on retrial].'

Id. (citing State ex rel. Holmes v. Court of Appeals, 885 S.W.2d 389 (Tex. Crim. App.
1994)).

 In Ex parte Franklin, 72 S.W.3d 671 (Tex. Crim. App. 2002), we held that when
we are presented with a Herrera-type claim based on newly discovered evidence, our first
consideration is whether the evidence presented constitutes affirmative evidence of
innocence, and only if that is provided will we move on to a determination of whether
Applicant can prove by clear and convincing evidence that no reasonable juror would
have convicted him in light of the newly discovered evidence. Franklin, 72 S.W.3d at
678.

ANALYSIS

 Applicant initially raised a Schlup-type claim that constitutional errors probably
resulted in the conviction of a man who is actually innocent. Applicant alleged a Brady
violation, knowing use of false testimony, and ineffective assistance of counsel. 
However, the record supports the trial court's recommendation that relief be denied on
each of these grounds. This leaves us with a bare innocence claim based on newly
discovered evidence. Applicant must show that the evidence he is presenting is newly
available or newly discovered and that the new evidence unquestionably establishes his
innocence. Only if this is shown are we called upon to compare the new evidence with
the evidence at trial in order to determine whether Applicant has shown by clear and
convincing evidence that no reasonable juror would have convicted him in light of the
new evidence. 

 First, while the science of forensic visual testing may be new, the evidence
Applicant relies on is not newly discovered or newly available. Shortly after the 1987
offense, investigators were able to observe the scene from the vantage point of the
eyewitnesses while the conditions were similar to the way they were the night of the
offense. The evidence gathered by investigators for both the State and the defense was
presented to the jury. The issues of lighting, distance, and the witnesses' ability to
identify Applicant were raised at trial. The jury heard the evidence regarding the
streetlight in the alley, the light in the back of one of the houses, and the light in the car,
as well as the defendant's evidence about how far away each witness was from the car. 
Three separate juries chose to believe the witnesses. Applicant's expert observed the
scene many years later, in 2003, when the conditions from the night of the offense were
unable to be replicated. For example, Gladys Oliver's house had been torn down, there
were new windows and a new fence at Cotton's house, a new shed had been built, the
lighting was different, tree growth had changed after 16 years, and there was no way to
ascertain exactly where in the alley the car had been on the night of the offense. Based on
this, the expert determined that it was physically impossible for the witnesses to see the
face of the person exiting the car.

 We agree with the State that not all scientific advances can be treated equally. 
While we have considered advances in science when determining whether certain
evidence, such as DNA, is newly discovered or newly available, the evidence presented
by Applicant is not the sort of evidence that is capable of being preserved and tested at a
later date. Forensic visual science may be new, but there is no way for the forensic visual
expert to test the conditions as they existed at the time of the offense because there is no
way to replicate the lighting conditions.

 We will consider advances in science and technology when determining whether
evidence is newly discovered or newly available, but only if the evidence being tested is
the same as it was at the time of the offense. Thus, the science or the method of testing
can be new, but the evidence must be able to be tested in the same state as it was at the
time of the offense.

 Applicant says that "scientific evidence establishes the wrongfulness" of his
conviction. However, an expert report saying that it was too dark and the car was too far
away for the eyewitnesses to have seen Applicant does not affirmatively establish his
innocence. All it does is attempt to discredit the witnesses who stated that they saw
Applicant get out of the victim's car. 

 The trial court concluded that the expert's report did discredit the eyewitnesses,
leaving only the testimony of Applicant's cellmate, Edwards, to support the jury's verdict. 
And, the trial court found Edwards's testimony not to be credible. The record, however,
does not support this finding. The trial court said that Johnson's statement is more
consistent with the facts of the murder and is more credible than the statement by
Edwards. But Johnson said the victim fell out of the trunk of the car and died, which is
inconsistent with the cause of death and the eyewitness testimony that the victim was
pushed out of the car. (5) Edwards said that Applicant beat the victim repeatedly and kicked
him out of the car, which is consistent with Stewart's testimony that he saw the victim get
pushed out of the car and with the determination that the cause of death was multiple
blows to the head. We also note that the eyewitnesses reported seeing two people exiting 
the car, while the version of the crime told by Johnson and Scott involved only one
person-Hubbard. Despite the expert's report that the eyewitnesses were unable to make a
facial recognition of the people they saw in the alley, we are confident that they would
have been able to discern whether it was one or two people, which further weakens the
credibility of Johnson's and Scott's statements. 

 Even if we determined that the evidence here was new, it does not unquestionably
establish Applicant's innocence. Applicant has not met threshold elucidated in Franklin. 

CONCLUSION

 The evidence standing alone is not dispositive of Applicant's claim of innocence. 
Franklin, 72 S.W.3d at 678. Because Applicant has not offered evidence that goes
toward affirmatively proving his innocence, relief is denied.


 Meyers, J.


Delivered: April 20, 2011

Publish
1. Applicant's name has been spelled both "Benjamin" and "Benjamine" in court
documents. Because Applicant himself spells it "Benjamine," that is the spelling we will use.
2. Schlup v. Delo, 513 U.S. 298 (1995).
3. Herrera v. Collins, 506 U.S. 390 (1993).
4. Ex parte Elizondo, 947 S.W.2d 202 (Tex. Crim. App. 1996).
5. The trial court found that when the victim's BMW was in the alley, Stewart was too far
from the car to identify Applicant, but the court did not rule on Stewart's testimony that he had
seen the victim being pushed out of the car. Stewart did not testify at the writ hearing.