

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,464

### EX PARTE NEAL HAMPTON ROBBINS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 98-06-00750-CR FROM THE
### 410TH JUDICIAL DISTRICT COURT OF MONTGOMERY COUNTY

**PRICE, J., filed a concurring opinion in which MEYERS and HERVEY, JJ., joined.**

### CONCURRING OPINION

The applicant raises two claims in this post-conviction application for writ of habeas corpus: actual innocence and false evidence. Each type of claim is cognizable in the post-conviction habeas context and, should they pan out, each could serve independently to defeat the State's otherwise legitimate interest in the finality of its convictions. But, though each finds its basis in the Due Process Clause of the Fourteenth Amendment, the two types of claims suffice to defeat the State's finality interest for different reasons.

A claim of actual innocence is cognizable, we have recognized, because due process will not tolerate stigmatizing and punishing an individual who can definitively demonstrate

that he did not commit the crime for which he has been convicted.[1]  Thus, actual innocence is concerned with the accuracy of the original proceeding.  If the applicant can produce new evidence that affirmatively demonstrates his innocence (and does not simply call the State's original evidence of his guilt into question), and, factoring that new evidence in with the trial evidence, the habeas court concludes by clear and convincing evidence that no rational jury would have convicted him, he is entitled to relief.[2]  That is a "Herculean" burden, we have said,[3] and it is meant to be.  Otherwise, trials would cease to be the so-called "main event" of our adversarial criminal justice system,[4] and the State would never be able to depend upon the finality of its convictions.

A claim of false evidence, on the other hand, is predicated less on due process concerns with the bottom-line accuracy of the trial result and more on fundamental due process guarantees of fairness in the main event itself.[5]  If we are to afford the result of a

---

[1]  *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).

[2]  *Ex parte Franklin*, 72 S.W.3d 671, 677 (Tex. Crim. App. 2002).

[3]  *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006).

[4]  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977).

[5]  *E.g., Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (due process is offended "if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.  Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the

criminal trial a presumption of finality, then we must be able to assure defendants that, as the main event, the trial will be conducted in as fair a manner (less than absolutely perfect) as we can muster. There is nothing fair about a trial in which it can be shown that the State deliberately utilized perjured, fabricated, false, or even just plain misleading evidence to obtain a conviction. Even a defendant who is absolutely guilty—assuming we could ever objectively know such a thing, apart from the convention of an institutional factfinder's verdict—may obtain a new trial if his original trial was tainted by such glaring unfairness and (in the habeas corpus context) he can establish that the unfairness more likely than not contributed to his conviction.[6]

But what if neither the State nor the defendant was aware that some material evidence that was admitted at trial was perjured, fabricated, false, or misleading? In the last several years, we have held that a habeas applicant may still obtain relief under these circumstances, utilizing the same standard of harm (for obtaining relief in state habeas corpus proceedings) as applies to the State's knowing use of such evidence.[7] It is not entirely clear to me, however, in the context of the *inadvertent* use of such evidence, whether the primary due process impetus is to assure the fairness of the process or the accuracy of the result (or maybe

obtaining of a like result by intimidation.").

[6]
   *Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996).

[7]
   *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009); *Ex parte Napper*, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010).

a little of each). Is it that it strikes us as unfair to uphold a conviction that is based upon false evidence regardless of the source of the evidence or the motive behind its admission? In other words, is misconduct or malfeasance on the State's part unnecessary to our perception that the process has not operated fairly? Or are we more concerned that a conviction based upon what later turns out to be false evidence does not provide sufficient assurance that we are stigmatizing and punishing a truly guilty defendant? While these concerns are obviously interrelated, they are, nonetheless, distinct. And it is important, in defining whether a particular due process claim is compelling enough to defeat the State's presumptive interest in finality, to understand the distinction. Knowing how to set the appropriate boundaries for what we are willing to call "false" evidence in the first instance largely depends upon which due process rationale—fairness or accuracy—is predominant.

I think it is fair to say that the State's inadvertent use of false evidence is not as unfair as the State's deliberate use of false evidence. So the justification for holding that the State's inadvertent use of false evidence may defeat its otherwise legitimate interest in finality must hinge more on a concern for the accuracy of the result. And yet, before a concern for accuracy may, by itself, justify undoing a criminal conviction, we have said that the habeas applicant must satisfy the "Herculean" burden of establishing his actual innocence.[8] Unless we are to allow our false evidence jurisprudence unduly to encroach upon our actual

---

[8] *Ex parte Brown*, *supra*.

innocence jurisprudence, it seems to me that when it comes to claims of the inadvertent use of false evidence, we must not be overly liberal in how we characterize "false" evidence.

And that brings me to the facts of the instant case.[9] Dr. Moore has renounced her trial testimony that the cause of death was asphyxiation by compression.[10] None of the experts who have re-examined the autopsy results and other relevant data, including Dr. Norton, is currently willing to say that asphyxiation by compression was the cause of death. But nor do any of the experts rule out asphyxiation by some *other* cause, such as suffocation,[11] and none can rule out homicide as the manner of death.[12] Dr. Norton remains of the opinion that the manner of death *was* homicide. She believes the cause of death was asphyxiation by

---

[9] What follows in this paragraph are uncontroverted facts as gleaned from the habeas record and consistent with the convicting court's recommended findings of fact entered at the conclusion of the protracted habeas corpus proceedings.

[10] The applicant nowhere argues that Moore was not a qualified expert at the time of trial for purposes of the Rules of Evidence. TEX. R. EVID. 702.

[11] The applicant was charged with and convicted of capital murder. Capital murder is "a result-of-conduct oriented offense." *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). The indictment alleged that the applicant "intentionally and knowingly cause[d]" the victim's death "by asphyxiating" her. It did not allege—and need not have alleged for purposes of charging a complete offense—how the asphyxiation was accomplished, and the State's ability to convict the applicant was not contingent on proof of any particular means of asphyxiation.

[12] *See Sanchez v. State*, ___ S.W.3d ___, 2010 WL 3894640 (Tex. Crim. App., No. PD-0961-07, delivered Oct. 6, 2010) (Slip op. at *6) ("In medicine, every death is in one of four 'manners': natural, accidental, homicidal, or suicidal"); & *id*. n.31 ("National Association of Medical Examiners and The College of American Pathologists, 'Medical-Legal Death Investigation and Autopsy' (2003) (defining 'Manner of Death' as 'The circumstance surrounding death, such as: natural, accident, suicide, homicide, undetermined, or pending.'").

suffocation. The only thing demonstrably "false" about Moore's trial testimony, then, is her opinion that the death was *caused* by asphyxiation *by compression*. We cannot say for certain that her trial conclusions that the cause of death was asphyxiation, and that the manner of death was homicide, were necessarily false, or even that they were mistaken. The worst that can be said is that Moore's trial testimony left a false impression, since most of the experts now believe that the cause of death, while it *may* have been *some* means of asphyxiation, was *not* asphyxiation by *compression*, and that the manner of death is "undetermined."

On this state of the record, it is clear enough to me that the convicting court was correct to recommend that we reject the applicant's actual innocence claim. That Moore has changed her mind that the autopsy revealed a homicide, and now believes that the manner of death is "undetermined," does not constitute "affirmative evidence of innocence." It would be different, perhaps, were she now willing to testify that the manner of death was something *other than* a homicide. Far from that, however, she persists in her opinion that the death was, at least, "suspicious." By now declaring the manner of death to be "undetermined," she only serves retroactively to impugn the State's case for the applicant's guilt; she does not affirmatively demonstrate the applicant's innocence. No other expert has opined that the death was *not* a homicide. That at least one other pathologist, Dr. Norton, remains willing to characterize the death as a homicide—however assailable her opinion may be—further supports the conclusion that Moore's re-evaluation does not affirmatively

demonstrate the applicant's innocence. After all, there is no new scientific breakthrough, no new definitive study, that has convinced Moore that her original assessment of the data was insufficiently informed from the perspective of the underlying science. Instead, she testified that she simply changed her mind, in light of certain circumstantial facts (not related to the autopsy) that she was unaware of in arriving at her original opinion,[13] and with the benefit of additional professional experience since the time of the applicant's trial.

Does Moore's apparent mistake about the specific cause of death and her subsequent change of mind with respect to the manner of death mean that her trial testimony was "false"? If we say that it does, it will have the consequence of entitling the applicant to post-conviction habeas corpus relief even though he has not affirmatively demonstrated his

---

[13] During her deposition, Moore testified:

> Q. What is it that – what factually can you point me to in your medical findings or your autopsy findings that caused you to change your opinion?

> A. It's not really the medical that's changed. It's when I reviewed the whole file and reviewed the testimonies and the EMT reports and the medical records that made me change my opinion, and that's listed in my affidavit.

At trial, Moore had testified that CPR performed on the child-victim could not have been the cause of certain bruising found on the child-victim's back that led her to believe that the child-victim had suffered violence at the hands of an adult. These circumstances suggested asphyxiation by compression as the cause of death and homicide as the manner of death. *See* Majority opinion at 29 ("Well, back then I did believe that the bruising on the back and the chest compressions was what caused the baby; so, I believed that was caused by another person. That's what I believed back then, but I don't believe that now."). In her affidavit, Moore explained that, after reviewing the case file and other trial testimony, none of which she had been aware of at the time of trial, she concluded that the circumstances of the CPR were such that it could have caused those bruises after all.

innocence. The applicant concedes that there was no malfeasance on the prosecutor's part in presenting Moore's (apparently) honest and sincere appraisal of the autopsy data at trial.[14]

---

14

   In its recommended findings of fact, the convicting court observed:

> Dr. Moore's trial opinions as to cause and manner of death were not true. They were based on false pretenses of competence, objectivity, and underlying pathological reasoning that were not given in good faith. They were admittedly not justified by the objective facts and pathological findings in this case. Her trial opinions in this case were expert fiction calculated to attain a criminal conviction . . .

> Dr. Moore's giving scientifically unsupported testimony at a time when she was biased toward the State and unqualified to render opinions on the issues involved in this case equates to her giving false testimony, or at least giving a false impression that was of such a nature as to contrive a conviction through the pretense of a trial which in truth was a deception of the Court and jury.

> While the State could not have known at the trial of the falsity of Moore's testimony, due to her public position and agency relationship with the State, her knowingly giving false testimony equates to the giving or allowing of false testimony by the State.

While there is more than sufficient evidence in the record to support the convicting court's doubt about the "competence, objectivity, and underlying pathological reasoning" underlying Moore's trial testimony, I do not find much support for the propositions that she did not give it in good faith, that it was consciously "biased," and that it constituted "expert fiction calculated to attain a criminal conviction." It is true that, during her deposition, Moore acknowledged that Dr. Joye Carter, the Chief Medical Examiner in Harris County when Moore was employed there at the time of the applicant's trial, had found it necessary to admonish Moore that she should "never be in a position where it is perceived that the medical examiner is a witness for one particular side." Moreover, Moore also endorsed Carter's observation that "during this time period [Moore] was making a transition from pediatric pathologist to the neutral position of a forensic pathologist." Moore also admitted that there were at least two other cases at that time in which she concluded that a particular infant's death was a homicide, only later to change her finding to "undetermined." But Moore nowhere admitted that she gave consciously biased or bad faith testimony at the applicant's trial, and I do not believe this evidence establishes that Moore's trial testimony was "knowingly" false, as the convicting court recommends that we find. As I observed recently, "[t]his Court is the 'ultimate' factfinder [in post-conviction habeas corpus proceedings], with the prerogative to reject the convicting court's recommendations on those rare occasions when we deem it appropriate, even

Should we, nevertheless, declare her trial testimony to be "false" for purposes of due process analysis because she has since disowned it? I believe that to do so would place too high a premium on accuracy of results as a justification for dismantling an otherwise legitimate conviction. There was nothing *unfair* about the trial as it occurred. It is possible, of course, to retroactively regard any given trial as "unfair" if new evidence—scientific, medical or otherwise—objectively and definitively shows that good faith trial testimony was inaccurate or false. That is the lesson of *Estrada v. State*.[15] But, except with respect to her testimony as to the specific cause of death (asphyxiation *by compression*), proof of which is not necessary to a conviction for the result-of-conduct offense of capital murder,[16] it has not objectively and definitively been established that Moore's trial testimony *was* inaccurate or false. It was a medical/scientific opinion, based upon her education, training and experience-as-of-that-time. That she has since recanted it does not necessarily mean it was inaccurate or false, either now or when she expressed it at trial. Even now, she is unwilling to say that

when they are supported by the record, if we think another disposition is manifestly *better* supported by the record." *Ex parte Spencer*, 337 S.W.3d 869, 2011 WL 1485448 (Tex. Crim. App., No. AP-76,244, decided April 20, 2011) (Price, J., concurring), at *10 n.1. I would exercise that prerogative to find that Moore did not *knowingly* testify falsely, but at most inadvertently injected an inaccuracy—that the cause of death was asphyxiation *by compression*—and a misimpression—that the manner of death could be determined to be homicide—into the trial.

15

313 S.W.3d 274, 286-88 (Tex. Crim. App. 2010) (due process violation resulted from the admission of inaccurate testimony from State's witness with respect to inmate-classification status for capital murder defendant were he to be assessed a life-without-parole sentence, where both parties agreed that the inaccuracy was inadvertent, not intentional).

16

*See* n.11, *ante*.

the manner of death was *not* homicide—only that, based on the data, she cannot currently say that it *was*. To call Moore's testimony "false" under these circumstances, and thereby grant the applicant habeas relief out of an overriding concern for the accuracy of the result, is essentially to grant an actual innocence claim without requiring the applicant to satisfy the usual "Herculean" burden.

With these supplemental comments, I join the Court's opinion.

FILED:      June 29, 2011
PUBLISH